UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| JAMES D. MCCONNELL, ) | |
| ) | Case No. 4:23-cv-24 |
| *Plaintiff*, ) | |
| ) | Judge Travis R. McDonough |
| v. ) | |
| ) | Magistrate Judge Susan K. Lee |
| UNITED STATES DEPARTMENT OF ) | |
| AGRICULTURE, THOMAS JAMES ) | |
| VILSACK, in his official capacity, and ) | |
| KEVIN SHEA, in his official capacity, ) | |
| ) | |
| *Defendants*. ) | |

**MEMORANDUM OPINION**

Before the Court is Plaintiff James McConnell's motion for a preliminary injunction (Doc. 14) against Defendants United States Department of Agriculture ("USDA"), Thomas Vilsack, the United States Secretary of Agriculture, and Kevin Shea, Administrator of the Animal and Plant Health Inspection Service ("APHIS"), requesting that the USDA be enjoined from enforcing the Horse Protection Act ("HPA"), 15 U.S.C. § 1821 *et seq.*, against Plaintiff via its administrative process. For the reasons set forth below, Plaintiff's motion for preliminary injunction (Doc. 14) will be **DENIED**.

I.  **BACKGROUND**

Plaintiff James McConnell is a licensed horse trainer who owns and operates Formac Stables, Inc. ("Formac Stables"), in Shelbyville, Tennessee. (Doc. 1, at 3.) Formac Stables boards and trains Tennessee Walking Horses on behalf of the horses' owners. (*Id.*) Tennessee Walking Horses are shown in competitions across the southeastern United States and are known for their "distinctive gait." (*Id.* at 5.) A horse can be forced to perform this gait by the practice

of "soring." (*Id*.) "Soring" is the deliberate injury of a horse by a variety of means, including applying blistering agents, burns, cuts, or nails and screws which cause the horse pain and distress when walking. 15 U.S.C. § 1821(3). Congress passed the HPA to end the "cruel and inhumane" practice of soring and to prevent sored horses from "compet[ing] unfairly" with horses that were not subjected to soring. *Id.* § 1822. The HPA prohibits, in relevant part, the "showing or exhibiting, in any horse show or horse exhibition, of any horse which is sore." *Id.* § 1824(2)(A).

The HPA is enforced by the USDA and authorizes the Secretary of Agriculture ("the Secretary"), after notice and hearing, to assess violators a civil monetary penalty. *Id.* § 1825(c). The Secretary may also disqualify the violator from showing or exhibiting horses for a period of years. *Id.* The USDA begins enforcement proceedings by filing an administrative complaint against alleged violators. 7 C.F.R. § 1.131, 2.27. The proceeding is then assigned to a USDA Administrative Law Judge ("ALJ"). *Id.* Either party may request a hearing before the ALJ. *Id*. §§ 1.141, 1.142. The ALJ conducts the hearing and issues a decision. *Id.* A party may appeal the decision of the ALJ to the USDA Judicial Officer. *Id*. § 1.145(a).

Under the 1940 Schwellenbach Act, the Secretary may delegate his authority to review the decisions of the ALJs to no more than two "officers or employees" who may be assigned "appropriate titles." 7 U.S.C. § 2204-2. The Secretary "may at any time revoke the whole or any part of a delegation or designation made by him." *Id*. However, a revocation of authority "shall not be retroactive," and any decision made by the delegee "shall be considered as having been performed by the Secretary." *Id*. § 2204-3. The officer to whom the Secretary has delegated his authority is called the Judicial Officer. 7 C.F.R. § 1.132. Upon consideration of an appeal of the ALJ's decision, the Judicial Officer issues a final decision. *Id*. § 1.145(i). Only

2
Case 4:23-cv-00024-TRM-SKL   Document 30   Filed 09/13/23   Page 2 of 16   PageID #: 826

decisions of the Judicial Officer are final for purposes of judicial review.  *Id*. §§ 1.139, 1.142(c)(4).  A party may petition the Judicial Officer for a rehearing or reconsideration of his decision, which the Judicial Officer has the discretion to grant or deny.  *Id.* § 1.146.

The USDA filed two complaints against Plaintiff in 2016 and 2017, respectively.  (Doc. 1, at 10.)  The USDA alleges that Plaintiff violated the HPA by entering in a show or showing a horse that has been sored, entering in a show or showing a horse bearing a prohibited substance, and failing to provide required information to regulatory authorities.  (Doc. 24, at 19.)  As a result, nine alleged HPA violations are pending against Plaintiff.  (Doc. 1, at 10.)

Plaintiff filed this action on July 14, 2023.  (Doc. 1.)  He then moved for a preliminary injunction.  (Doc. 14.)  Plaintiff argues that the USDA's administrative structure described above is facially unconstitutional.  (Doc. 17, at 9.)  Specifically, he argues that the process "violates the Appointments Clause, the Seventh Amendment, and Article III."  *Id.*

## II.   STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  In the Sixth Circuit, a district court is not required to hold an evidentiary hearing on a motion for preliminary injunction when the material facts are not in dispute.  *Id.* at 553.  Here, the parties agree that Plaintiff's motion raises purely legal issues and that no material facts are in dispute.  (Doc. 28.)

The Court considers the following factors when evaluating a motion for preliminary injunction:

>   (1) whether the movant has a strong likelihood of success on the merits;
>   (2) whether the movant would suffer irreparable injury without the injunction;

>   (3) whether issuance of the injunction would cause substantial harm to others; and
>   (4) whether the public interest would be served by the issuance of the injunction.

*Id.* at 542 (citations omitted).

The Sixth Circuit has noted that "when a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (citations omitted). Furthermore, the Court need not "make specific findings concerning each of the four factors . . . if fewer factors are dispositive of the issue." *Id.* (citations omitted). However, "it is generally useful for the district court to analyze all four of the preliminary injunction factors." *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)). "Rather than function as "rigid and unbending requirements[,]" the factors "simply guide the discretion of the court." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992).

"The party seeking a preliminary injunction bears the burden of justifying such relief." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (citations omitted). While a party seeking a preliminary injunction need not "prove [its] case in full at a preliminary injunction hearing," *Tenke,* 511 F.3d at 542 (citations omitted), a preliminary injunction is an "extraordinary and drastic remedy." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), and "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739.

**III.    ANALYSIS**

### A. Likelihood of Success on the Merits

Plaintiff asserts that several aspects of the USDA's administrative proceedings are unconstitutional. He argues: (1) the position of Judicial Officer violates the Appointments Clause; (2) USDA ALJs are improperly supervised inferior officers; and (3) he has the right to a jury trial in an Article III court. (Doc. 17, at 9.) Plaintiff has not carried his burden of demonstrating that he has a strong likelihood of success on any of these grounds.

#### i. *Judicial Officer*

Plaintiff first argues that the position of Judicial Officer violates the Appointment Clause because the Judicial Officer either (1) exercises principal-officer power as "merely an employee," or (2) is a principal officer who has not properly been appointed by the President and confirmed by the Senate. (Doc. 17, at 9–10.) Both arguments turn on one question: is the Judicial Officer an inferior officer?

The Appointments Clause provides, in part, that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. However, "[o]nly the President, with the advice and consent of the Senate, can appoint noninferior officers." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021). An officer may be "inferior" rather than "principal" even if they exercise "significant authority pursuant to the laws of the United States." *Edmond v. United States*, 520 U.S. 651, 662 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)). Whether an officer is an inferior officer who may be appointed by an agency head "depends on whether he has a superior other than the President." *Arthrex*, 141 S. Ct. at 1980 (internal quotations omitted) (quoting *Edmond*, 520 U.S. at 662). "An inferior officer must be

5

Case 4:23-cv-00024-TRM-SKL   Document 30   Filed 09/13/23   Page 5 of 16   PageID #: 829

'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Id.* (quoting *Edmond*, 520 U.S. at 663).

To determine whether an officer is "effectively supervised," courts must apply the test set forth in *Edmond*. *Id.* Under this test, sufficiency of supervision is determined by looking primarily at whether (1) the officer is bound to follow regulations promulgated by an agency head, (2) the officer can be removed at will and without cause by the agency head, and (3) the agency head can review the decisions of the officer. *See id.* (laying out the factors considered under *Edmond*). Still, there is no "exclusive criterion for distinguishing between principal and inferior officers." *Edmond*, 520 U.S. at 661. As a result, "the line between 'inferior' and 'principal' officers is one that is far from clear." *Rop v. Fed. Hous. Fin. Agency*, 50 F.4th 562, 570 (6th Cir. 2022) (quoting *Morrison v. Olson*, 487 U.S. 654, 671 (1988)), *cert. denied*, 143 S. Ct. 2608 (2023).

Applying *Edmond* to the present case, the Secretary likely has a high enough degree of supervision and control over the Judicial Officer for the Judicial Officer to qualify as "inferior." The Secretary may promulgate regulations which the Judicial Officer must follow. 15 U.S.C. § 1828; 7 C.F.R. § 1.131; *see Edmond*, 520 U.S. at 662 (finding that the ability of the Judge Advocate General to "prescribe uniform rules of procedure" weighed in favor of inferior-officer status); *see also Morrison*, 487 U.S. at 671–672 (finding that independent counsel being bound to "comply to the extent possible with the policies of the [Department of Justice]" weighed in favor of inferior-officer status). Furthermore, the Judicial Officer is removable at will, and the Secretary may revoke his delegation of authority to the Judicial Officer at any time. 7 U.S.C. § 2204-2. While not dispositive, the Supreme Court has repeatedly emphasized that "[t]he power to remove officers at will and without cause is a powerful tool for control." *Free Enter. Fund v.*

*Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010) (internal quotations and citations omitted). In the recent Supreme Court decision, *Free Enterprise Fund v. Public Company Accounting Oversight Board*, removability was the decisive factor for determining whether officers were inferior. *See id*. at 510 (concluding that under *Edmond*, officials were inferior "[g]iven that the Commission … possess[es] the power to remove Board members at will, and given the Commission's other oversight authority").

It is true that the Secretary may not "retroactively" revoke his delegation of authority and that the Judicial Officer's decisions are not reviewable by the Secretary. 7 U.S.C. § 2204-3; *see Utica Packing Co. v. Block*, 781 F.2d 71, 74 (6th Cir. 1986) ("Since the Judicial Officer acts for the Secretary, the only post-decision proceeding open to the USDA is a petition to the Judicial Officer for reconsideration."). However, the Sixth Circuit has explained that the fact that the Secretary cannot review the Judicial Officer's decisions does not defeat inferior-officer status. In *Varnadore v. Secretary of Labor,* 141 F.3d 625 (6th Cir. 1998), the Sixth Circuit examined the Department of Labor's Administrative Review Board ("ARB"). Like the Judicial Officer, "the ARB acts for the Secretary and is responsible for issuing *final agency decisions* on questions of law and fact arising in review or on appeal." *Id*. at 630 (emphasis added) (internal quotations omitted). Nonetheless, the court determined that "the members of the ARB are, at most, the type of 'inferior' officers that the Appointments Clause allows the heads of departments . . . to appoint" and that "the Appointments Clause was not offended by the creation of the ARB."[1] *Id.* at 631–32.

---

[1] Plaintiff argues that *Varnadore* is no longer good law as it conflicts with *Arthrex*. (Doc. 17, at 11 n.1). For the reasons discussed below, the Court cannot agree.

Plaintiff leans heavily on the Supreme Court's recent decision in *Arthrex*, in arguing that the Judicial Officer is improperly appointed. Plaintiff argues *Arthrex* established a de facto bright-line standard that a person is a principal officer who must be appointed by the President and confirmed by the Senate if he can issue a final agency decision which is not subject to review. (Doc. 17, at 11.) If true, *Arthrex* would essentially overrule *Edmond*. *See Edmond* 520 U.S. at 661 (Holding that there is not an "exclusive criterion for distinguishing between principal and inferior officers"). However, a close reading of *Arthrex* suggests *Edmond* remains the law. In fact, *Arthrex* explicitly states just that.

In *Arthrex*, the Supreme Court held that the Patent Trial and Appeal Board's Administrative Patent Judges ("APJs") violated the Appointments Clause. *Arthrex*, 141 S. Ct. at 1985. In doing so, the court emphasized that "[w]hat matters is that the Director have the discretion to review decisions rendered by APJs." *Id.* at 1988. The court also stated that "[o]nly an officer properly appointed to a principal office may issue a final decision binding the Executive Branch." *Id*. at 1985. Such a sweeping statement, standing alone, seems to support Plaintiff's position that *Edmond* no longer controls. However, in the very next line, the court noted that "we do not attempt to 'set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes.'" *Id*. (quoting *Edmond*, 520 U.S. at 661). The court goes on to declare that "we reaffirm and apply the rule from *Edmond*." *Id.* at 1988.

Indeed, *Arthrex* applies *Edmond* by considering the fact that the APJs were bound by regulations promulgated by the PTO Director and that APJs were not removable at will. *Arthrex*, 141 S. Ct. at 1982 ("Nor are APJs 'meaningfully controlled' by the threat of removal from

federal service. . . ."). If reviewability were the sole test, there would be no reason for the court to have considered APJ's removability and control by regulations.

This Court takes *Arthrex* at its word that *Edmond* remains the test and that reviewability is not the sole consideration.[2] Even if Plaintiff's reading of *Arthrex* ultimately prevails, the present state of the law cuts against Plaintiff at the preliminary-injunction phase as the burden is on him to make a clear and strong showing of likelihood of success on the merits. *See Pub. Int. Rsch. Grp. of Mich. (Pingam) v. Brinegar*, 517 F.2d 917, 918 (6th Cir. 1975) (finding that the district court "clearly acted within the scope of a proper exercise of discretion in refusing to grant a preliminary injunction" when "the possibility that the appellants would succeed on the merits was at best uncertain and problematical"). Plaintiff, therefore, has not made a strong showing of likelihood of success on the merits on this ground.

### ii.      ALJs

Plaintiff next argues that USDA ALJs are improperly supervised inferior officers. (Doc. 17, at 12.) As noted above, the key inquiry is whether the ALJs are subject to adequate supervision by a principal officer. This again requires the Court to apply the *Edmond* test described above.

Under *Edmond*, the Secretary likely exercises sufficient supervision and control over the ALJs. The Secretary has the power to issue binding procedural and substantive regulations. 15

---

[2] Plaintiff is also saddled with unfavorable precedent, as the only circuit court opinion which examined in depth the effect of *Arthrex* on the *Edmond* test concluded that *Arthrex* did not lay down a new rule solely concerned with reviewability. In *Bahlul v. United States*, No. 22-1097, 2023 WL 4714324 (D.C. Cir. July 25, 2023), the D.C. Circuit noted that, "[d]espite the language in *Arthrex* [emphasizing reviewability], that case still considered each of the three factors that were central to *Edmond*: degree of oversight and removability, as well as final decision-making authority." 2023 WL 4714324, at *7. The court concluded that *Arthrex* was "not sufficiently clear to justify overturning the law of the circuit" given that it "explicitly denied that it relied on an 'exclusive criterion' to hold that the Patent Judges were principal officers." *Id*. at *8.

U.S.C. § 1828; 7 C.F.R. § 1.131. Perhaps most importantly, the Secretary has the statutory authority to "at any time revoke the whole or any part of a delegation or designation made by him" to the Judicial Officer to review the decisions of the ALJs. 7 U.S.C. § 2204-2. This means that the Secretary can step in and review the decisions of an ALJ before it is reviewed by the Judicial Officer.[3] *See Fleming v. United States Dep't of Agric.*, 987 F.3d 1093, 1103 (D.C. Cir. 2021) (Finding that "the Secretary may, at his election, step in and act as final appeals officer in any case"). Furthermore, because the Secretary can remove the Judicial Officer at will and the Judicial Officer typically reviews the decisions of the ALJs, this is yet another tool to oversee the ALJs. 7 U.S.C. § 2204-2. At least one circuit court has concluded that USDA ALJs are properly supervised inferior officers. Applying *Edmond*, the D.C. Circuit found "little difficulty classifying the Department's ALJs as inferior officers." *Fleming*, 987 F.3d at 1103.

It is true that the ALJs may be dismissed only for cause by the Merit Systems Protection Board, which itself consists of members who themselves can only be dismissed for cause. 5 U.S.C. § 7521(a); 5 U.S.C. § 1202. While this dual-layer, for-cause removal protection does raise questions about whether the Secretary has adequate control, it is still likely that the ALJs are inferior officers properly supervised by the Secretary. This is especially true if Plaintiff is correct that the touchstone of inferior-officer status is reviewability.

---

[3] Plaintiff insists that the Secretary cannot review ALJs' initial decisions, citing *Utica Packing Co. v. Block*, 781 F.2d 71, 74 (6th Cir. 1986). (Doc. 25, at 8.) However, *Utica Packing* held only that the Secretary violated due process by creating an unacceptable "appearance of bias" when he removed a Judicial Officer *after* he had issued a final decision and appointed a new unqualified and apparently biased Judicial Officer to *rehear* the case. 781 F.2d at 74–78. The decision does not address whether the Secretary could step in before the Judicial Officer has taken up an appeal of an ALJ's decision. The 1940 statute seems to plainly authorize this move and the logic of *Utica Packing* does not bar it since the same appearance of bias would not be present. 7 U.S.C. § 2204-2.

Because the Secretary likely has sufficient ability to supervise and rein in the ALJs, Plaintiff has failed to make a strong showing that he is likely to succeed on the merits of this claim.

### iii. Jury Trial in an Article III Court

Finally, Plaintiff argues that he is entitled to a jury trial and that he is entitled to have his case heard in an Article III court. (Doc. 17, at 14, 19.) These claims rise and fall together. *See Oil States Energy Servs. LLC v. Greene's Energy Grp.*, LLC, 138 S. Ct. 1365, 1379 (2018) (citations omitted) ("[W]hen Congress properly assigns a matter to adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.") (internal quotations and citations omitted).

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const.. amend. VII. A jury trial may be required for claims created by statute when the action is "analogous to 'Suits at common law.'" *Tull v. United States*, 481 U.S. 412, 417 (1987). A statutory claim is analogous to a common law claim if: (1) it is sufficiently similar to "18th-century actions brought in the courts of England prior to the merger of the courts of law and equity," and (2) it provides a legal (monetary) remedy. *Id.* at 417–18 (citations omitted).

However, even if the statutory claim is analogous to a common law claim, the "public-rights" doctrine may still allow the claim to be heard before an administrative agency without a jury. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 51 (1989). The Supreme Court held in *Granfinanciera* that "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at

common law.'" *Id*. (citation omitted). This is true even when the cause of action is "closely analogous" to common law claims. *Id.* at 52. Public rights are not always clearly defined but generally concern actions "arising between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Stern v. Marshall*, 564 U.S. 462, 489 (2011) (internal quotations and citations omitted). Public rights are implicated when "the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority." *Id.* at 490.

There is no need to go beyond the first step of the analysis here. Plaintiff argues that an action to enforce the HPA is analogous to both common law fraud and breach of contract and that the remedy under the HPA is legal since the Secretary can assess civil fines. (Doc. 17, at 14–15.) While it is true that civil penalties can be assessed under the HPA, the statute is not analogous to common-law claims for fraud or breach of contract. Instead, it is a distinct cause of action created by Congress and properly assigned to a federal agency to administer within its area of expertise. Common law fraud in Tennessee requires: (1) an intentional misrepresentation, (2) of a material fact, (3) which the defendant knows to be false, (4) which is made with fraudulent intent, (5) which produces a false impression, (6) which is made in order to mislead another or to obtain an undue advantage over him, (7) upon which the plaintiff must have reasonably relied, (8) resulting in an injury to the plaintiff.[4] *First Nat. Bank of Louisville v.*

---

[4] Plaintiff offers a slightly different formulation of common law fraud in Tennessee:

> the elements of common-law fraud are (1) the "representation of an existing or past fact," (2) that is "false," (3) that regards a "material fact," (4) that is made knowingly, "without belief in its truth," or recklessly, (5) the plaintiff relied on the "misrepresented material fact," and (6) the plaintiff is harmed as a result of the fraud.

*Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991). The parts of the HPA Plaintiff is alleged to have violated require proof of none of these elements.[5] The HPA notably does not require any false statements or misrepresentation, nor does it require any injury to a third party. Simply because it is possible to commit both common law fraud and violate the HPA at the same time does not mean the claims are analogous. Similarly, the elements of common law breach of contract in Tennessee are: "[1] the existence of a valid and enforceable contract, [2] a deficiency in the performance amounting to a breach, and [3] damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). Again, none of these elements must be proven to prove a violation of the HPA. While a violation of the HPA may also breach the competition contracts Plaintiff entered, this does not automatically make the two analogous. If this were indeed the standard for establishing if a federal law was analogous to a common law claim, then any law, no matter what conduct it concerned, would be equivalent to common law breach of contract whenever a contract required compliance with a federal law, or incorporated a federal standard.[6]

---

(Doc. 17, at 15 (citing *Edwards v. Travelers Ins. of Hartford*, 563 F.2d 105, 110–13 (6th Cir. 1977).) Under either formulation, the result is the same.

[5] USDA alleges that Plaintiff violated the HPA by: (1) entering in a show or showing a horse that has been sored, 15 U.S.C. § 1824(2); (2) entering in a show or showing a horse bearing a prohibited substance, *id.* § 1824(7); and (3) failing to provide required information to regulatory authorities, *id*. § 1824(9). (Doc. 24, at 19.)

[6] Even if the HPA were analogous to common law claims, the HPA falls squarely within the public-rights exception. The enforcement of the HPA is an action brought by the federal government against an individual. Furthermore, the HPA is a part of federal administrative scheme regulating animal welfare which relies on USDA adjudications. Plaintiff notes the extended time that his own case has been under investigation. However, this is a facial attack to the USDA's administrative proceedings and, in general, there is no reason for the Court to believe that the agency process is anything but a "prompt, continuous, expert, and inexpensive method for dealing with a class of questions of fact which are peculiarly suited to examination and determination by an administrative agency specially assigned to that task." *Crowell v. Benson*, 285 U.S. 22, 46 (1932); *see also Atlas Roofing Co., Inc. v. Occupational Safety &*

Plaintiff has not clearly demonstrated that he is likely to succeed on this ground either.

B.     **Irreparable Injury**

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). When a plaintiff's "constitutional rights are threatened or impaired, irreparable injury is presumed." *Vitolo v. Guzman*, 999 F. 3d 353, 360 (6th Cir. 2021). However, this presumption is not due when it is unlikely a plaintiff's constitutional claims will succeed on the merits. *See Overstreet,* 305 F.3d at 578 ("[I]t is unlikely that [Plaintiff] will be able to demonstrate that he has a cognizable constitutional claim. Thus, his argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit.")

The sole risk of injury that Plaintiff asserts is being "forced to defend himself" in the agency proceedings against him which he claims are unconstitutionally structured. (Doc. 17, at 20.) Plaintiff asserts a violation of his constitutional rights, but, since Plaintiff has not established that he is likely to succeed on the merits, a presumption of irreparable harm is not due. *See, e.g.*, *Overstreet*, 305 F.3d at 578. Accordingly, Plaintiff has not established he will suffer irreparable harm.

C.     **Harm to Others & Public Interest**

The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556

---

*Health Rev. Comm'n*, 430 U.S. 442, 445 (1977) (upholding agency adjudications of workplace safety violations despite the existence of "state common-law actions for negligence and wrongful death").

U.S. 418, 435 (2009). "[T]he public interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (citations omitted). However, a mere assertion that a constitutional right is violated does not mandate a finding that an injunction is in the public interest. *See Overstreet*, 305 F.3d at 566 ("[W]hile the public clearly has interest in vindicating constitutional rights, it is unlikely that [the plaintiff] can demonstrate that any constitutional rights are implicated.") Furthermore, it is in the public interest to enforce legitimate laws that implicate a matter of public importance. *See Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021) ("[T]he public interest necessarily weighs against enjoining a duly enacted statute, and our assessment that the appellants will likely prevail on the merits tips the public-interest factor further in their favor.").

Preventing the abuse of horses by swift enforcement of the HPA is clearly in the public interest, and the enforcement of the HPA in this case has proceeded at more of a trot than a gallop.[7] Plaintiff and Defendants agree that the practices the HPA seeks to address are of legitimate and serious public concern. Plaintiff calls horse soring an "unfortunate practice" carried out by "[a]busive trainers" (Doc. 17 at 2), while Defendants call the HPA a "bulwark against animal cruelty and the destructive practices in the horse industry." (Doc. 24, at 1.)

Plaintiff correctly notes that the public interest is served by preventing the violation of constitutional rights. (Doc. 17, at 21.) However, Plaintiff has failed to demonstrate that he is likely to succeed on the merits of his claims and therefore has not demonstrated that an

---

[7] As Plaintiff notes, the enforcement actions against him began in 2013. (Doc. 1, at 10.) It is not fully clear to the Court what caused this delay, but it does not appear to be simply due to neglect on the part of Defendants. Plaintiff's hearing before the ALJ is set for October 10, 2023. (Doc. 17, at 7.) It makes no sense to pull back the reins now, with the parties in the home stretch of the administrative proceedings.

injunction is in the public interest. The equities favor Defendants since the swift enforcement of the HPA is in the public interest.

## IV. CONCLUSION

For the aforementioned reasons, Plaintiff's preliminary-injunction motion (Doc. 14) is hereby **DENIED**.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**